

**SIGNED this 13th day of March, 2012**

_____

Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

In re:                                          No.  09-13154
                                                Chapter 11
TRINITY COMMUNICATIONS, LLC,

      Debtor and Debtor-in-Possession;


TRINITY COMMUNICATIONS, LLC,

      Plaintiff

v                                               Adversary Proceeding
                                                No.  11-1101

MOMENTUM TELECOMMUNICATIONS, INC.,

      Defendant.


### MEMORANDUM

The Defendant Momentum Telecommunications, Inc. ("Momentum" or "Defendant")

moves to compel arbitration and for a stay of this adversary proceeding pending the outcome of

the arbitration. [Doc. No. 5].[1]  The plaintiff debtor Trinity Communications, Inc. ("Debtor" or "Trinity") failed timely to respond to the motion, but filed a belated response on September 20, 2011. [Doc. No. 13].  This court has granted Trinity's motion to extend the time to respond to Momentum's motion to compel arbitration and to stay this adversary proceeding. [Doc. No. 15].  The court has also considered a reply filed by Momentum. [Doc. No. 14-2, 16].  The creditor Genesis Merchant Partners, L.P. ("Genesis") also filed a late-filed response in opposition to the motion to compel arbitration. [Doc. No. 21].  Momentum sought leave to file a sur-reply, which this court granted. [Doc. Nos. 22, 22-1, 24].  Genesis filed a motion to file yet another sur-reply, which this court also granted. [Doc. Nos. 26, 26-1, 27].  On October 31, 2011, the court entered an order denying the Motion to Arbitrate and setting an evidentiary hearing on the issue of whether the arbitration provision or a liquidated damages provision contained in the Second Services Agreement were provisions outside of the ordinary course of Trinity's business. The parties have stipulated by an Agreed Order, entered on February 2, 2012 (Doc. No. 39), that these provisions were provisions that the Debtor agreed to in the ordinary course of its business. Momentum has renewed its motion and the Reorganized Debtor has not responded. The court has reviewed the pleadings, stipulation, and briefing filed by the parties and Genesis, as well as the record and the applicable law and makes the following findings of fact and conclusions of law pursuant to Fed. Rule Bankr. P. 7052.

## I.      Background Facts

Trinity filed a Chapter 11 bankruptcy petition on May 22, 2009.  [Bankr. Case No. 09-13154].  Trinity is a Tennessee limited liability company that provides media services, including internet and cable services to customers.  *See* [Doc. No. 1, ¶ 1, Doc. No. 6, p. 1].

Momentum provides services deploying, maintaining, and supporting voice

---

[1] All docket entry numbers pertain to adversary proceeding number 11-1101 unless otherwise indicated.

communications systems and equipment to customers of cable operating companies using voice over internet protocol ("VoIP"). Momentum provided services both prepetition and post-petition to the Debtor. On June 19, 2009 Momentum filed a proof of claim in the amount of $22,187.87 in Trinity's bankruptcy case based on "services provided." [Bankr. Case No. 09-13154, Claim No. 8-1]. On October 7, 2010, the Debtor filed an Amended Chapter 11 Plan and Disclosure Statement. [Doc. Nos. 152 and 153] Momentum's claims are not addressed in that disclosure statement and plan. On November 29, 2010, several creditors, including Momentum, filed objections to the confirmation of Trinity's Chapter 11 bankruptcy plan. *See* [Bankr. Case No. 09-13154, Doc. Nos. 173, 174, 175]. On December 9, 2010, this court cancelled the hearing pertaining to the various creditor objections to confirmation of Trinity's plan. *Id.* at Doc. Nos. 181, 182, 183.

On December 15, 2010, Momentum filed an application for administrative expenses. [Bankr. Case No. 09-13154, Doc. No. 185]. In the application for administrative expenses, Momentum detailed how it had entered into a Master Services Agreement with Trinity on February 21, 2007 that would allow Trinity to offer Momentum's voice over internet protocol services ("VoIP") to Trinity's customers ("First Master Services Agreement"). The VoIP system allows Momentum to "deploy[ ] maintain[ ], and support[ ] voice communications systems and equipment for customers of cable . . ." [Bankr. Case No. 09-13154, Doc. No. 185, ¶ 2].

The First Master Services Agreement provided that:

8.5    Disputes
(a)  Any and all disputes between the parties that arise under or in connection with this Agreement which cannot be resolved through good faith negotiation shall be submitted to non-binding mediation, and, if such mediation fails to produce a mutually acceptable result, the dispute shall then be submitted to binding arbitration, to be conducted in accordance with the Commercial Arbitration rules of the American Arbitration Association, and any judgment of the arbitrator(s) rendered pursuant to such a proceeding shall be enforceable in any court having jurisdiction thereof.

(b)  Notwithstanding the foregoing, neither party shall be prohibited from seeking or obtaining temporary or injunctive relief under any circumstances where such relief is necessary or appropriate.

8.6    Governing Law.
This Agreement shall be governed and construed in accordance with the laws of the State of Alabama, U.S.A., without regard to its choice of law rules.

[Bankr. Case No. 09-13154, Doc. No. 185-1, First Master Services Agreement, p. 9, ¶¶ 8.5-8.6].

The term of the First Master Services Agreement expired on February 21, 2010. *See*

[Bankr. Case No. 09-13154, Doc. No. 185, Application for Administrative Expenses, ¶ 8].

However, it automatically renewed for a one-year period at that time. *Id.* Prior to the expiration

of the automatically renewed First Master Services Agreement, Trinity and Momentum entered

into a second master services agreement ("Second Master Services Agreement") on October 1,

2010.  In the Second Master Services Agreement Momentum agreed to provide VoIP services

to the Debtor and its customers and also agreed to manage the Debtor's internet network. *Id.* at

¶ 9.

The Second Master Services Agreement contained two provisions that are the primary

reasons the Debtor and Genesis contend the court should deny Momentum's motion. The first is

a dispute resolution provision that was similar, but not identical, to the dispute resolution

provision of the First Master Services Agreement. The second is a liquidated damages

provision. Second Master Services Agreement, ¶ 7. The dispute resolution provision stated:

11.4    Disputes.
(a) Any and all disputes between the Parties that arise under or in connection with this Agreement which cannot be resolved through good faith negotiation shall be submitted to binding arbitration, to be conducted in Birmingham, Alabama in accordance with the Commercial Arbitration rules of the American Arbitration Association, and any judgment of the arbitrator(s) rendered pursuant to such a proceeding shall be enforceable in any court having jurisdiction thereof.
(b) Notwithstanding the foregoing, neither Party shall be prohibited from seeking or obtaining temporary or injunctive relief under any circumstances where such relief is necessary or appropriate.

11.5.  Governing Law.  This Agreement shall be governed and construed

in accordance with the laws of the State of Alabama, U.S.A., without regard to its choice of law rules.

[Bankr. Case. No. 09-13154, Doc. No. 185-2, at ¶¶ 11.4, 11.5].

The Liquidated Damages provision states:

The Parties to this Agreement recognize and understand that, given the Vendor's costs to build out its network to provide the Services herein, costs of its staff to support the Services, e.g..[sic] software development, technical expertise, customer support, and general administrative support, and existing and future long term obligations to third parties, e.g. carriers and software licensors, to name but a few, it will be difficult to determine or estimate the damage and injury caused to Vendor in the event of an uncured, material breach of this Agreement prior to the end of its term. Moreover, the Parties agree that Vendor must remain the exclusive provider of Services to Reseller to recover Vendor's costs in deploying and staffing its network. Consequently, the Parties agree that the Vendor shall be, at all times during the Agreement and any extensions thereof, the exclusive provider of all Services–and any similar Services, except Wi-Fi which Reseller provides separately through its own Public Wi-Fi and taps–to Reseller, and that this provision is a material covenant in the Agreement. Reseller further covenants and agrees that it will not purchase, lease or otherwise avail itself of the Services–or any similar Services– by or through any other third party or itself internally, the breach of which would constitute a material breach of the Agreement. Further, the Parties agree that Vendor shall be entitled to the following as reasonably based, liquidated damages, proportionate to Vendor's loss, in the event of Reseller's uncured, material breach of this Agreement: (i) for VoIP services, an amount equal to twenty-five dollars ($25.00) times the highest number of Reseller VoIP Subscribers in any one month times the number of months remaining in the Initial or Renewal Term, as the case may be, at the time of the breach; (ii) for other Services, the highest monthly or annual recurring charges paid by Reseller to Vendor under the Agreement times the number of months (or years as the case may be) left in the term or any extension thereof. The liquidated damages shall be the sum of the damages for all of the Services as computed in this Section. The remedies found in this section are cumulative to all other remedies the Vendor may have under other Sections in the Agreement and at equity or in law. RESELLER HAS ACCEPTED THIS EXCLUSIVITY AND LIQUIDATED DAMAGES PROVISION AS PART OF A BARGAIN TO LOWER THE PRICE OF VENDOR'S SERVICES AND UNDERSTANDS THAT THE PRICE WOULD BE HIGHER IF VENDOR WERE REQUIRED TO DISPENSE WITH THIS SECTION.

*Id.* at ¶ 7.

In the application for administrative expenses filed on December 15, 2010,

approximately two and a half months after the execution of the Second Master Services

Agreement, Momentum alleged the following:

10.   Momentum has continued to provide services post-petition to the Debtor under the Master Services Agreements.  Despite the services provided by Momentum and the Debtor's contractual obligation to pay Momentum for certain fees, costs and taxes as provided in the Master Services Agreements, the Debtor has failed to pay Momentum.  At this time $108,035.65 is due and payable from the Debtor to Momentum pursuant to the Master Services Agreements.

11.   In mid-October, 2010, Momentum met with the Debtor to discuss the status of the business arrangement between the parties.  At that time the Debtor indicated that its accounts payable with Momentum would be brought current by mid-November, 2010.  Despite these assurances, the Debtor has failed to bring its accounts current, and $108,035.65 remains due and payable.

12.   The amount owed by the Debtor to Momentum should be allowed and paid as an administrative expense under Section 503 of the United States Bankruptcy Code.  These amounts are actual, necessary costs and expenses of preserving the estate

. . . .

14.   Momentum should be allowed an administrative expense in the amount of $108,035.65, which the Court should require the Debtor to pay immediately.  Without payment of this expense, Momentum faces the risk of providing services without receiving any compensation.  At a minimum, in addition to the allowance of an administrative expense, Momentum should be granted adequate protection, such as in the form of a lien on the accounts generated by the services provided by Momentum.

[Bankr. Case No. 09-13154, Doc. No. 185, Application for Administrative Expenses, pp. 3-4].

The record demonstrates that the electronic filing system sent notice of the filing of the

Application for Administrative Expenses to Trinity and its creditors, including Genesis.  The

application included copies of the two Master Services Agreements.  *See* [Bankr. Case. No. 09-

13154, Doc. Nos. 185-1, 185-2].  The court held a hearing on February 8, 2011 on Momentum's

Application for Administrative Expenses. Only the Debtor responded by appearing at the

hearing. No creditor objected. The Debtor and Momentum announced that they would  submit

an agreed order to the court regarding the expenses.  The court entered the agreed order on

February 24, 2011. [Bankr. Case No. 09-13154, Doc. No. 197].  The order specified that the

Debtor owed Momentum $125,615.80 and that such amount would be allowed as an

administrative expense under 11 U.S.C. § 503. *Id.* at ¶ 1. The court further ordered Trinity to pay Momentum within twenty-one days of the order and clarified that "[t]his Order does not resolve any other issues or disputes between the Debtor and Momentum." *Id.* at ¶¶ 2-3. Whether the automatic renewal contracts or the Second Master Services Agreement were outside the scope of the Debtor's ordinary course of business was not raised by the Debtor or creditors. No party appealed the order.

On May 11, 2011 Momentum filed a Motion for Allowance and Payment of Administrative Expenses that alleged that Trinity had failed to pay the $125,615.80 in administrative expenses that the court ordered Trinity to pay in its order of February 24, 2011. [Bankr. Case No. 09-13154, Doc. No. 243, ¶ 15]. Momentum further alleged that Trinity had failed to pay Momentum for fees, costs and taxes that it was obligated to pay Momentum pursuant to the Master Services Agreements. Momentum also alleged that Trinity had breached the terms of the Master Services Agreements and now owed Momentum a total of $395,323.47 for VoIP services through April of 2011 and for liquidated damages. *Id.* at ¶ 21.

Trinity filed a response objecting to Momentum's claim for additional administrative expenses. [Bankr. Case No. 09-13154, Doc. No. 262]. Trinity then filed this adversary proceeding on July 14, 2011 seeking damages from Momentum pursuant to the Second Master Services Agreement. [Doc. No. 1]. No allegation was made in the Complaint that the contract was unenforceable because it had never been approved. Debtor originally claimed that certain terms were outside the scope of its ordinary course of business, but has now stipulated that even those terms are within the Debtor's ordinary course of business. Trinity admits that the services provided are clearly within the course and scope of its business under 11 U.S.C. § 363(c)(1). Complaint, ¶ 7.

Trinity also moved to consolidate Momentum's Motion for Allowance and Payment of Administrative Expenses with the adversary proceeding. [Bankr. Case No. 09-13154, Doc. No.

279].  On August 11, 2011 the court held a hearing on Trinity's motion to consolidate and granted the motion.  *Id.* at Doc. Nos. 289, 292.  It cancelled the hearing on Momentum's Motion for Allowance and Payment of Administrative Expenses.  *Id.*

Genesis filed a plan that provided for payment in full for non-tax priority claims and a one-time payment to unsecured creditors at $175,000. [Bankr. Case No. 09-13154, Doc. No. 247, p. 10, ¶¶ 4.2, 4.3].  Momentum objected to the confirmation of the plan based on the treatment of its administrative expense claims. [Bankr. Case No. 09-13154, Doc. No. 290].  To resolve Momentum's objection, at the confirmation hearing, the court overruled the objection, but provided that funds in the amount of $125,615.80 were to be placed in the registry of the court. [Bankr. Case No. 09-13154, Doc. No. 318].  The court confirmed Trinity's Chapter 11 plan on September 13, 2011.  *Id.* The plan has been consummated and the court holds the $125,615.80.

Momentum now moves to compel arbitration pursuant to the dispute resolution clauses of the Master Services Agreements and moves to stay this adversary proceeding pending the outcome of arbitration. [Doc. No. 5].  Trinity has filed a belated response and a request for an extension of time to file its response.  [Doc. Nos. 11, 13].  This court has granted Trinity's motion to file a belated response and has also granted Momentum's motion to file a reply brief. [Doc. Nos. 14, 15, 16].  In its reply brief, Momentum clarified for the court that

> [a]ll of the damages asserted by both the Debtor and Momentum are post-petition damages.  Momentum filed a proof of claim for pre-petition damages, but that proof of claim is not at issue in this adversary proceeding and will be paid out of the unsecured creditors' pool established under the Plan.

[Doc. No. 14-2, Momentum Reply Brief, p. 8 n.6].  Genesis, as an interested party, has also filed a brief opposing the motion to compel, to which Momentum has replied. [Doc. Nos. 21, 22-1].

## II.    Analysis

## A.    The Federal Arbitration Act

The Federal Arbitration Act ("FAA") states in relevant part that arbitration clauses in contractual agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA also provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  The FAA also provides that in instances in which a party has failed to comply with an arbitration provision, the aggrieved party may "petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

In *Shearson/American Express, Inc. v. McMahon*, the Supreme Court addressed the validity of arbitration clauses with respect to claims involving the Securities Exchange Act and the Racketeer Influenced and Corrupt Organizations Act.  482 U.S. 220, 107 S.Ct. 2332 (1987). In determining that such claims were subject to arbitration, the Supreme Court explained that a party opposing application of an arbitration clause must demonstrate that "Congress intended to make an exception to the Arbitration Act" pursuant to the applicable statute, "an intention discernible from the text, history, or purposes of the statute."  *Id.* at 227, 107 S.Ct. at 2338.  The Court instructed courts to examine whether "an inherent conflict between arbitration and the statute's underlying purposes" exists.  *Id.* The Supreme Court in *McMahon* also emphasized the purpose of the FAA, which included "revers[ing] centuries of judicial hostility to arbitration

agreements." *Id.* at 225, 107 S.Ct. at 2337 (citation omitted).

###### B.    The Application of Arbitration to Bankruptcy Cases

In *In re Electric Machinery Enter., Inc.* the Eleventh Circuit addressed whether Congress

indicated an intent to make an exception to arbitration in the Bankruptcy Code. *Whiting-Turner*

*Contracting Co. v. Electric Mach. Enter., Inc. (In re Electric Mach. Enter., Inc.)*, 479 F.3d 791

(11th Cir. 2007). The court noted that in "[a]pplying the *McMahon* factors to the Bankruptcy

Code, we find no evidence within the text or in the legislative history that Congress intended to

create an exception to the FAA in the Bankruptcy Code." *Id.* at 796. The court then examined

whether "an inherent conflict exists between arbitration and the underlying purposes of the

Bankruptcy Code." *Id.* In conducting this analysis the Eleventh Circuit noted:

> Courts addressing the issue of whether arbitration inherently conflicts with the
> Bankruptcy Code distinguish between core and non-core proceedings. In
> general, bankruptcy courts do not have the discretion to decline to enforce an
> arbitration agreement relating to a non-core proceeding. However, even if a
> proceeding is determined to be a core proceeding, the bankruptcy court must still
> analyze whether enforcing a valid arbitration agreement would inherently conflict
> with the underlying purposes of the Bankruptcy Code.

*Id.* at 796.

Other Circuit Courts have also opined on the arbitrability of claims raised in the context

of a bankruptcy case. For example, in *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith*,

the Third Circuit addressed the denial of the defendant's motion to compel arbitration of claims

asserted against it by the Chapter 11 trustee. 885 F.2d 1149 (3d Cir. 1989). In that case the

Third Circuit "conclude[d] that the Bankruptcy Code, as amended, does not conflict with the

Arbitration Act so as to permit a district court to deny enforcement of an arbitration clause in a

non-core adversary proceeding brought by the trustee in a district court." *Id.* at 1150. The

Court explained its reasoning:

> . . . given the recent Supreme Court cases concerning the Arbitration Act, we can
> no longer subscribe to a hierarchy of congressional concerns that places the
> bankruptcy law in a position of superiority over that Act. The message we get

> from these recent cases is that we must carefully determine whether any
> underlying purpose of the Bankruptcy Code would be adversely affected by
> enforcing an arbitration clause and that we should enforce such a clause unless
> that effect would seriously jeopardize the objectives of the Code.  Where, as
> here, a trustee seeks to enforce a claim inherited from the debtor in an adversary
> proceeding in a district court, we perceive no adverse effect on the underlying
> purposes of the Code from enforcing arbitration–certainly no adverse effect of
> sufficient magnitude to relieve a district court of its mandatory duty under the
> Arbitration Act as interpreted in the recent case law.

*Id.* at 1161 (footnote omitted).

Since the Third Circuit's ruling in *Hays*, several other Circuit Courts have followed the

Third Circuit's lead.  In *In the Matter of Nat'l Gypsum Co.* the Fifth Circuit expanded the *Hays*

decision beyond the realm of non-core proceedings.  *Insurance Company of North America v.*

*NGC Settlement Trust & Asbestos Claims Management Corp. (In the Matter of Nat'l Gypsum*

*Co.)*, 118 F.3d 1056 (5th Cir. 1997).  The Fifth Circuit noted that with respect to "derivative, non-

core matters" the decision of the Third Circuit had been "universally accepted."  *Id.* at 1066.

However, the Fifth Circuit refused to "adopt a position that categorically finds arbitration of core

bankruptcy proceedings inherently irreconcilable with the Bankruptcy Code."  *Id.* at 1067.  It

further explained that:

> [c]ognizant of the Supreme Court's admonition that, in the absence of an inherent
> conflict with the purpose of another federal statute, the Federal Arbitration Act
> mandates enforcement of contractual arbitration provisions, we refuse to find
> such an inherent conflict based solely on the jurisdictional nature of a bankruptcy
> proceeding.  Rather, as did the Third Circuit in *Hays*, we believe that
> nonenforcement of an otherwise applicable arbitration provision turns on the
> underlying nature of the proceeding, *i.e.*, whether the proceeding derives
> exclusively from the provisions of the Bankruptcy Code and, if so, whether
> arbitration of the proceeding would conflict with the purposes of the Code.  In this
> regard, we agree with INA that the discretion enjoyed by a bankruptcy court to
> refuse enforcement of an otherwise applicable arbitration provision depends
> upon a finding that the standard set forth in *McMahon* has been met.  But
> because we believe that [the plaintiffs'] declaratory judgment complaint – which
> concerned matters central to [the debtor's] confirmed reorganization plan and
> implicated contractual issues in only the most peripheral manner (if at all) – met
> this standard, we conclude that the Bankruptcy Court was within its discretion to
> refuse to order arbitration of the adversary proceeding. . . .

*Id.* (citing *McMahon*, 482 U.S. at 226-27, 107 S.Ct. 2337-38) (footnote omitted).  Other Circuit

Courts have also followed the analysis of *Hays* when determining whether arbitration is

mandatory. For example, in *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re*

*Crysen/Montenay Energy Co.)*, the Second Circuit noted that although "'[c]ore proceedings

implicate more pressing bankruptcy concerns,'" "'even a determination that a proceeding is core

will not automatically give the bankruptcy court discretion to stay arbitration.'" 226 F.3d 160, 166

(2d Cir. 2000) (quoting *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999)).   In

*Phillips v. Mowbray, L.L.C. (In re White Mountain Mining Co., L.L.C.)*, the Fourth Circuit,

following *McMahon*, affirmed the bankruptcy court's denial of a motion to compel arbitration

because "arbitration would have seriously interfered with the debtor's efforts to reorganize," a

fundamental purpose of the Bankruptcy Code.   403 F.3d 164, 166 (4th Cir. 2005).

In *In re Mintze* the Third Circuit clarified that its holding in *Hays* was not limited to non-

core proceedings.  434 F.3d 222, 230 (3d Cir. 2006).  The Court held that the *McMahon*

standard needed to be met before a bankruptcy court had the discretion to deny arbitration.  *Id.*

at 231. It noted that "the *Hays* decision did not seek to distinguish between core and non-core

proceedings; rather, it sought to distinguish between causes of action derived from the debtor

and bankruptcy actions that the Bankruptcy Code created for the benefit of the creditors of the

estate." *Id.* at 230. The Court concluded that "the standard we articulated in *Hays* applies

equally to core and non-core proceedings."  *Id.* at 231.

In *Javitch v. First Union Securities, Inc.* the Sixth Circuit addressed motions to compel

arbitration in a receivership context.  315 F.3d 619 (6th Cir. 2003). The Court cited the Third

Circuit decision in *Hays* with approval. *Id.* at 625.  At least one court in this Circuit has reviewed

the issue and determined that "[i]t appears likely that the Sixth Circuit would, in the appropriate

case, follow the holding in *Hays & Company*."  *Cooker Restaurant Corp. v. Seelbinder (In re*

*Cooker Restaurant Corp.)*, 292 B.R. 308, 311 (S.D. Ohio 2003).  The district court in that case

held that "in non-core proceedings in which the parties do not dispute the making of an

agreement to arbitrate, a bankruptcy court is without jurisdiction to deny a motion to stay the

proceedings and compel arbitration." *Id.* at 312 (footnote omitted).

In this district, the bankruptcy court has followed the lead of the Third Circuit in *Mintze*.

*See Great Spa Manuf. Co., Inc. v. Costco Wholesale Corp.*, No. 09-5009, 2009 WL 1457740

(Bankr. E.D. Tenn. May 22, 2009).  In that case the court cited the Third Circuit's decision in

*Mintze* with approval.  *Id.* at *5.  It determined that:

> [r]egardless of whether this action is core or non-core, it is undisputed, . . . that
> the Debtor's cause of action is not derived from any provision of the Bankruptcy
> Code.  Thus, no inherent conflict between the Bankruptcy Code and the Federal
> Arbitration Act is presented.  In bringing this action to recover prepetition
> accounts, the Debtor is bound by its arbitration agreements, just as it would have
> been had this bankruptcy case not been filed.
>
> In this regard, the court agrees that the determinative inquiry in enforcing an
> arbitration provision is the source of the Debtor's cause of action, rather than the
> core/non-core jurisdictional distinction. . . .

*Id.* at *6. The *Great Spa Manuf. Co.* court also relied on several cases within this Circuit that

granted motions to compel arbitration where no inherent conflict with the Bankruptcy Code was

established.  *See e.g.*, *In re Transport Assocs., Inc.*, 263 B.R. 531, 535 (Bankr. W.D. Ky. 2001)

(granting motion to compel arbitration of objection to creditor's claim even though issues arose

through "claims allowance process" where "the arbitration of this contractual dispute does not

directly conflict with the Bankruptcy Code"); *Pelikan Holding AG v. Nu-Kote Holding, Inc. (In re

Nu-Kote Holding, Inc.)*, 257 B.R. 855, 864 (Bankr. M.D. Tenn. 2001) (finding that "'inherited

contractual claims' derivative of the prebankruptcy agreements" were subject to arbitration);

*James P. Barkman, Inc. v. Granger Constr. Co. (In re James P. Barkman, Inc.)*, 170 B.R. 321

(Bankr. E.D. Mich. 1994) (granting motion to dismiss and force arbitration where debtor in

possession failed to meet its burden of proof to demonstrate an exception to Section 3 of the

FAA).

### C.     Scope and Validity of Arbitration Agreement

Under the Sixth Circuit's decision in *Javitch*:

> Before compelling an unwilling party to arbitrate, the court must engage in a
> limited review to determine whether the dispute is arbitrable; meaning that a valid
> agreement to arbitrate exists between the parties and that the specific dispute
> falls within the substantive scope of that agreement.  "[A]ny doubts concerning
> the scope of arbitrable issues should be resolved in favor of arbitration, whether
> the problem at hand is the construction of the contract language itself or an
> allegation of waiver, delay, or a like defense to arbitrability."

315 F.3d at 624 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-

25, 103 S.Ct. 927 (1983) *superseded by statute on other grounds by* Federal Arbitration Act,

Pub. L. No. 100-702, 102 Stat. 4670, § 15, 9 U.S.C. § 16) (other citations omitted).

Turning to the adversary proceeding at hand, the court must first examine whether a

valid arbitration agreement exists and whether the specific disputes raised by the parties fall

within the substance of that arbitration agreement.  *See Javitch*, 315 F.3d at 624.

The Complaint asserts that it "involves post-petition business transactions" between the

parties.  [Doc. No. 1, Complaint, ¶ 3].  The Complaint further describes the parties' interactions

pursuant to the pre-petition First Master Services Agreement and the post-petition Second

Master Services Agreement.  *See id.* at ¶¶ 5-6.  The Complaint contends that Momentum

breached the Master Services Agreements.  Momentum's application for administrative

expenses relates to its contention that Trinity has breached both Master Services Agreements.

The parties both rely on the terms of both Master Services Agreements for their positions.

Further, neither party denies that the Master Services Agreements both contain dispute

resolution provisions that contemplate arbitration.  The Debtor and Momentum have stipulated

that the arbitration clause of the Second Master Services Agreement is within the ordinary

course of business and thus did not need court approval pursuant to 11 U.S.C. § 363(c)(1).

That stipulation is supported by the substance of the Master Services Agreement. The First

Master Services Agreement contained an arbitration clause that is similar, although not

identical, to the arbitration clause of the Second Master Services Agreement.  One difference

between the two contracts is where the arbitration will be held – in Birmingham. The court notes

that both agreements stipulate the contract will be construed using Alabama law, so using a

location where arbitrators will be familiar with the relevant law does not seem to be a significant

difference.  A second difference is that the First Master Services Agreement includes an initial

step of using mediation before proceeding to arbitration of disputes while the Second Master

Services Agreement allows the parties to move directly to arbitration.  Again, the court does not

find this to be a significant difference. The agreement to arbitrate does not create the potential

for more significant expense than the risk of litigation if a contract were breached. The

arbitration provision meets the tests for ordinary course of business both with respect to

dealings between the Debtor and Momentum and the expectations of creditors. *See In re Media

Central*, 115 B.R. 119 (Bankr. E.D. Tenn. 1990).

The "ordinariness" of the second provision, the Liquidated Damages paragraph, is more

controversial from a precedential viewpoint. The Debtor and Genesis both argued that this

provision was outside the ordinary course of business, but have changed their positions. In

considering this provision to be within the ordinary course of business, the court is not finding

that a liquidated damages clause will never cause a contract to fall outside the ordinary course

of business. The better practice for debtors would be to obtain court approval on any contract

which creates a significant administrative expense for the estate. However, in this case, the plan

has been confirmed and unsecured creditors have been paid their full distribution. To the extent

that those creditors expected notice or wanted notice of the Debtor's execution of a contract

with such a provision, they never raised the issue and the outcome of this dispute will not affect

their distribution. They never sought to obtain any increase in their dividend in the event that

Momentum was not successful.

Further, when Momentum sought allowance of $125,000 in expenses and attached

copies of the agreements, no creditor objected at that time that the second agreement was

outside the ordinary course of business. The only creditor now objecting had a security interest

in all assets, controlled cash collateral, and was the proponent of the plan. The discussion of

Momentum's claim is under the section "Ordinary Course Expenses, Including Claims by

Momentum Telecom, Inc." [Bankr. Case No. 09-13154, Doc. No. 248, p. 11, Disclosure

Statement]. Despite that heading, the Disclosure Statement specifically mentions that the

liquidated damages provision on which Momentum relies is not enforceable as a penalty under

state contract law, and the provision was not entered into in the ordinary course of business and

was not approved by the court. *Id.* Based on the statements in the disclosure statement, even if

the court finds that the provision is enforceable as a result of the parties' recent stipulation that

the provision was in the ordinary course of business, Trinity and Genesis will still have the

defense of unenforceability under Alabama law. Finally, if the court found that the Liquidated

Damages clause takes the Second Master Services Agreement out of the ordinary course of

business, First Master Services Agreement will still go to arbitration and terms of the parties'

relationship for the period after February 2010 would be left in limbo. Therefore, the court

concludes that the arbitration provision and the liquidated damages provision were entered into

in the ordinary course of Trinity's business and a valid arbitration provision exists.

It also appears that the parties' disputes regarding the fees payable to Momentum under

the Master Services Agreements, as well as Trinity's claims for breach of the agreements to

provide certain services, are encompassed within the broad scope of the arbitration provision of

the Second Master Services Agreement.  The arbitration clause provides that "[a]ny and all

disputes between the Parties that arise under or in connection with this Agreement which

cannot be resolved through good faith negotiation shall be submitted to binding arbitration . . ."

[Bankr. Case. No. 09-13154, Doc. No. 185-2, at ¶ 11.4].  This provision is broad in scope and

clearly encompasses the parties' dispute about the fees owed under the agreement, as well as

Momentum's obligations to provide VoIP services to Trinity.  Thus, the court concludes that a

valid arbitration agreement exists and the parties' disputes fall within the broad scope of "any

and all disputes between the Parties" arising in connection with the agreement.

### D.      The Core Versus Non-Core Debate

The next step in this court's analysis is to resolve whether, under *McMahon*, the parties

opposing arbitration, in this case Trinity and Genesis, have sustained their burden of proof of

demonstrating "an inherent conflict exists between arbitration and the underlying purposes of

the Bankruptcy Code."  *In re Electric Mach. Enter., Inc.*, 479 F.3d at 796. *See also McMahon*,

482 U.S. 227, 107 S.Ct. 2338.  The parties in this case spend much time debating whether this

adversary proceeding involves core or non-core issues and whether the court thus has

discretion to deny arbitration.

In particular, Momentum relies on the recent Supreme Court case of *Stern v. Marshall*.

___ U.S. ____, 131 S.Ct. 2594, 2620 (2011).  In that case the Court determined that a

bankruptcy court did not have "constitutional authority to enter a final judgment on a state law

counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.*  This

ruling effectively found that 28 U.S.C. § 157(b)(2)(C)'s description of core proceedings as

including "counterclaims by the estate against persons filing claims against the estate" was

unconstitutional where the counterclaim of the estate against a person filing a claim against the

estate was a state law counterclaim unrelated to the proof of claim or the Bankruptcy Code.  In

*Stern* the debtor's stepson filed a proof of claim in the debtor's bankruptcy case alleging

defamation, and the debtor filed a counterclaim against her stepson claiming tortious

interference with a gift she expected from her deceased husband.  *Id.* at 2601.  The Supreme

Court determined that although the counterclaim was a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(C), that provision, as applied to the state law counterclaim against the stepson, was

unconstitutional.  The Court initially determined that the stepson consented to the "Bankruptcy

Court's resolution of his defamation claim" by filing a proof of claim in the debtor's bankruptcy

case and by asserting that the bankruptcy court had authority to resolve the proof of claim

issues in an adversary proceeding.  *Id.* at 2607-2608.  It was only after more than two years had

passed from the time the stepson filed his initial proof of claim that he first objected to the

bankruptcy court resolving the proof of claim.  *Id.*  The Supreme Court concluded that due to the

stepson's "course of conduct before the Bankruptcy Court," "he consented to that court's

resolution of his defamation claim (and forfeited any argument to the contrary)."  *Id.* at 2608.

However, with respect to the debtor's counterclaim of tortious interference with contract,

the Supreme Court found that although 28 U.S.C. § 157(b)(2)(C) permitted its resolution by the

bankruptcy court, Article III of the U.S. Constitution did not.  *Stern*, 131 S.Ct. at 2608.  When the

debtor argued that the bankruptcy court could resolve the counterclaim because the stepson

was "a creditor in the bankruptcy," the Supreme Court disagreed.  *Id.* at 2611.  It noted:

> . . . the debtors' claims in the cases on which [the debtor] relies were themselves
> federal claims under bankruptcy law, which would be completely resolved in the
> bankruptcy process of allowing or disallowing claims.  Here [the debtor's] claim is
> a state law action independent of the federal bankruptcy law and not necessarily
> resolvable by a ruling on the creditor's proof of claim in bankruptcy.

*Id.*

Momentum argues that because the estate has filed a claim against it that is a state law

breach of contract claim, *Stern v. Marshall* applies, and the counterclaim is no longer a core

proceeding under 28 U.S.C. § 157(b)(2)(C) because the counterclaim involves state law breach

of contract issues.  However, Momentum also filed a proof of claim in Trinity's bankruptcy case

asserting an amount due under the First Master Services Agreement. [Bankr. Case No. 09-

13154, Claim 8-1].  It further filed two applications for administrative expenses with this court.

*See* [Bankr. Case No. 09-13154, Doc. Nos. 185, 243].  Thus, Momentum consented to this

court's resolution of its proof of claim and its application for administrative expenses.  Further,

Momentum's claims and Trinity's claims in this adversary proceeding are more related than

were the state law torts at issue in *Stern v. Marshall*.  As one district court explained:

> "[F]ollowing *Marathon*, it is well-settled that [the Constitution] prohibits bankruptcy
> courts from adjudicating pre-petition contract claims–that is, claims arising prior
> to the commencement of the debtor's bankruptcy–against a nonparty to the
> bankruptcy."  Accordingly, the Second Circuit has held that "a breach of contract
> action by a debtor against a party to a pre-petition contract, who has filed no
> claim with the bankruptcy court, is non-core."  However, where a defendant to a
> pre-petition contract action has filed a proof of claim against the estate, the
> defendant has "sought the benefits of the bankruptcy court's jurisdiction" and the
> matter will be deemed core.

*Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108, 120

(S.D.N.Y. 2001) (citing *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50,

102 S.Ct. 2858 (1982)) (quoting *Tultex Corp. v. Freeze Kids, L.L.C.*, 252 B.R. 32, 36 (S.D.N.Y.

2000); (*Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1102 (2d Cir. 1993))

(other citations omitted).

        This case involves a creditor who has filed a proof of claim and two applications for

administrative expenses.  Although the initial proof of claim is not at issue in this Adversary

Proceeding according to Momentum, the application for administrative expenses has been

consolidated with this proceeding. [Bankr. Case No. 09-13154, Doc. No. 292].

        In addition, in this action the contracts at issue include a prepetition contract, the

automatic renewal of that contract, as well as a postpetition contract.  Although Momentum's

claims against the estate involve state law breaches of both contracts, Momentum sought this

court's resolution of those claims.  Were these the court's only considerations, the court would

be inclined to keep the matter.  However, the estate's counterclaims against Momentum also

include state law breach of contract claims that do not involve the resolution of bankruptcy

issues as much as they involve the extent to which Momentum did or did not meet its

obligations to provide VoIP services under the Master Services Agreements.  Further, at this

point in the proceeding, the potential for conflict between arbitration and the purposes of

bankruptcy law is almost nonexistent.  The court concludes that, as explained below, there is an

easier solution to the resolution of Momentum's motion than determining whether all of the issues raised by both Momentum in the application for administrative expenses and by Trinity in its Complaint are core or non-core.

>    **E.      Whether an Inherent Conflict Between Arbitration and the Purposes of the Bankruptcy Code Exists**

Although the parties spend considerable effort debating whether the issues raised by the parties are core or non-core, and as a result, whether this court has the discretion to deny arbitration, the court finds it more productive to follow the lead of other courts, including *National Gypsum*, *Mintze*, and *Great Spa Manuf. Co.*, and conclude that the core/non-core distinction is not dispositive.  *See* 118 F.3d at 1067; 434 F.2d 230-31; 2009 WL 1457740 at *6.  Rather, the court will return to the *McMahon* standard to determine whether "an inherent conflict exists between arbitration and the underlying purposes of the Bankruptcy Code."  *In re Electric Mach. Enter., Inc.*, 479 F.3d at 796.

Genesis originally argued that there is such a conflict, citing 11 U.S.C. §§ 363(c)(1), 503. 11 U.S.C. § 363(c)(1) provides that:

> [i]f the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  The parties have now stipulated that the agreement was entered into in the "ordinary course of business" pursuant to 11 U.S.C. § 363(c)(1) and therefore, notice and a hearing regarding the agreement were not required pursuant to 11 U.S.C. § 363(c)(1).

Relying on 11 U.S.C. § 503, Genesis argues that "bankruptcy law also serves the purpose of equitably distributing the assets of the estate among creditors." [Doc. No. 21, p. 6]. It asserts that priority disputes are matters within the exclusive jurisdiction of this court. However, Trinity's Chapter 11 plan has been confirmed.  The amount of funds to creditors has

already been established, and the issues present in the proceeding will only affect what is paid

to Momentum, not to the other creditors in the case.  *See* [Bankr. Case No. 09-13154, Doc. No.

247, pp. 9-10].

Genesis cites *Cuvrell v. Mazur (In re F&T Contractors),* a Sixth Circuit case from 1981

issued prior to the Supreme Court's decision in *McMahon,* in support of its position.  649 F.2d

1229 (6th Cir. 1981) (concluding that bankruptcy court did not abuse its discretion in denying

motion to compel arbitration).  In that case the "Sixth Circuit affirmed the lower courts' refusal to

enforce an arbitration provision in the parties' contract."  *In re James P. Barkman, Inc.*, 170 B.R.

at 322.  In *In re James P. Barkman, Inc.*, the bankruptcy court addressed an argument similar to

the argument Genesis makes here:

> [i]n so ruling, the [Sixth Circuit in *Cuvrell*] concluded that a bankruptcy court need
> not make "a finding that the arbitration would subvert special bankruptcy
> concerns" before declining to enforce an arbitration agreement.  Alternatively, the
> court stated that "[e]ven if a finding that arbitration will subvert special bankruptcy
> interests were necessary," such a "finding has been made" because "the
> [debtor's] general creditors would not be represented in the arbitration between . .
> . the trustee" and the other party to the contract.  As will be explained, however,
> subsequent caselaw has undermined the validity of both of these holdings.

*Id.*  The bankruptcy court then explained how the Supreme Court's decision in *McMahon*

overruled *Cuvrell* "insofar as it held that a bankruptcy court may properly refuse to enforce an

arbitration clause notwithstanding the lack of 'a finding that the arbitration would subvert special

bankruptcy concerns.'" *Id.* at 323.  It further noted, that with respect to the creditor's argument

that its interests would not be represented in the arbitration, the Sixth Circuit has determined in

numerous decisions following *Cuvrell* that the trustee represents both secured and unsecured

creditors.  *Id.* (citing *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir. 1982); *In re C-L

Cartage Co.*, 899 F.2d 1490, 1492 (6th Cir. 1990), *superseded by statute on other grounds* Pub.

L. No. 95-598, 92 Stat. 2601, 11 U.S.C. § 550; *In re White*, 851 F.2d 170, 174 (6th Cir. 1988)).

The bankruptcy court then granted the motion to dismiss the adversary and enforce an

arbitration agreement, finding that the party opposing arbitration had not fulfilled its burden of proof.  170 B.R. at 324. *See also, In re Nu-Kote Holding, Inc.*, 257 B.R. at 862 (ordering parties to proceed to arbitration and noting that "two decades of Supreme Court arbitration jurisprudence since *Cuvrell* strongly counsels that the Sixth Circuit would now embrace the decisions of other circuits that have enhanced enforceability of arbitration clauses in bankruptcy proceedings").  For these reasons, the court concludes that *Cuvrell* does not apply with equal force today as when it was written.

The court concludes that the other cases upon which Trinity and Genesis rely in opposing the motion to compel arbitration are distinguishable from the situation present in this proceeding.  For example, in *In re White Mountain Mining Co., L.L.C.,* the Fourth Circuit upheld the bankruptcy court's decision to deny a motion to compel arbitration where "the arbitration would have substantially interfered with the debtor's efforts to reorganize."  403 F.3d at 170.  In this case Trinity's Chapter 11 plan of reorganization has already been confirmed and the plan consummated. *See* [Bankr. Case No. 09-13154, Doc. No. 318].

In *Katchen v. Landy*, the Supreme Court determined that the bankruptcy court had jurisdiction to "order the surrender of voidable preferences asserted and proved by the trustee in response to a claim filed by the creditor who received the preferences."  382 U.S. 323, 325, 86 S.Ct. 467, 470 (1966).  Thus, the case involved the avoidance of a preference, and the Court found that as such, under the prior bankruptcy statutes, it was "part and parcel of the allowance process and [was] subject to summary adjudication by a bankruptcy court." *Id.* at 330, 86 S.Ct. at 473. *See also, Langenkamp v. Culp*, 498 U.S. 42, 45, 111 S.Ct. 330, 331 (1990) (finding that where the respondents "filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court," "they were not entitled to a jury trial on the trustee's preference action"). In contrast, this adversary proceeding involves the parties' claims of breach of the Master Services Agreements, instead of avoidance of preferences. In

addition, the importance of bankruptcy court's involvement in the allowance process would be minimal at this point since the only claim that remains to be determined is Momentum's.

Indeed, the Supreme Court in *Stern v. Marshall* also distinguished both *Katchen* and *Langenkamp*, finding that in *Stern* "there was never any reason to believe that the process of adjudicating [the stepson's] proof of claim would necessarily resolve [the debtor's] counterclaim." 131 S.Ct. at 2617.  In contrast, both *Katchen* and *Langenkamp* involved the resolution of preference actions by the trustee that became "'integral to the restructuring of the debtor-creditor relationship.'" *Id.* (quoting *Langenkamp*, 498 U.S. at 44, 111 S.Ct. 330).  In addition, in both of those cases "the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law."  *Stern*, 131 S.Ct. at 2618.  The debtor's counterclaim in *Stern* was "a state tort action that exist[ed] without regard to any bankruptcy proceeding."  *Id.*

The court finds no other policy underlying the Bankruptcy Code with which arbitration will interfere in this proceeding.  The parties have agreed to arbitrate disputes in the past in their pre-petition First Master Services Agreement.  The court has confirmed Trinity's Chapter 11 plan, and the dividend to creditors has been established.  No party objected to Momentum's application for administrative expenses, in which Momentum detailed the Master Services Agreements and provided copies of their provisions to the relevant parties.   In *In re Nu-Kote Holding* the court found, in granting a motion to compel arbitration, that "[i]mpact on the bankruptcy estate is minimal based on the confirmed Chapter 11 plan."  257 B.R. at 865.  The same concept applies here with equal force.

Moreover, the parties' disputes involve state law breach of contract issues pertaining to telecommunications.  The choice of law provision in the agreements call for the use of Alabama law in interpreting its provisions.  There is no reason that an arbitration panel in Alabama cannot resolve the parties' contract disputes under the Master Services Agreement and determine

whether the liquidated damages clause is unenforceable as well as this court can.

To the extent that Trinity asserts that an arbitration panel in Birmingham, Alabama will be biased against it, the court rejects that assumption.  The U.S. Supreme Court itself has "'decline[d] to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.'" *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30, 111 S.Ct. 1647 1654 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634, 105 S.Ct. 3346, 3357-3358 (1985)).

Based on the analysis of the standard set forth in *McMahon* and for the policy reasons described, the court concludes that submission of the parties' breach of contract disputes to arbitration in accordance with the arbitration clause of the Second Master Services Agreement will not interfere with an inherent policy underlying the Bankruptcy Code.  Trinity and Genesis have failed to sustain their burden of proof regarding why the arbitration clause should not be enforced.  Momentum's motion to compel arbitration and stay this proceeding will therefore be **GRANTED**.

### III.    Conclusion

For the reasons explained *supra*, the court will **GRANT** Momentum's motion to compel arbitration and will stay this adversary proceeding until the resolution of the parties' disputes following arbitration.

A separate order will enter.

# # #